UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

KATHLEEN PRIEST,

                    Plaintiff,

    v.

UNITED STATES OF AMERICA,

                    Defendant.

_____

Case No. 3:14-cv-500-AC

FINDINGS AND
RECOMMENDATION

ACOSTA, Magistrate Judge:

*Introduction*

        Plaintiff Kathleen Priest ("Priest") filed this personal injury action against the United States of America ("United States") pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 2671-2680 (the "Act"), after being allegedly injured in a collision with a United States Postal Service ("Postal Service") vehicle. Priest claimed $234,605.65 in damages in her initial administrative claim filed with the Postal Service ("Claim") and the original complaint filed in this court against the United

States ("Complaint").  Before the court are Priest's motion to amend the Complaint ("Motion"), and supplement the Motion ("Supplement").  The Motion and Supplement seek to increase the damages alleged in the Claim and Complaint, resulting in a new total damage amount of $382,521.55.

The court concludes the evidence on which Priest relies constitutes newly discovered evidence or intervening facts not reasonably foreseeable at the time Priest filed the Claim. Accordingly, the Motion and Supplement should be granted.  Priest should be allowed to amend the Complaint to include economic damages resulting from the unforeseeable medical and therapy expenses and non-economic damages related thereto.

*Background*

Priest was involved in an automobile accident with a Postal Service employee and vehicle on November 5, 2011 (the "Accident").  (Compl. ¶ 3.)  Priest alleges the Postal Service employee, who ran a red light and struck Priest's car, was negligent.  (Compl. ¶¶ 3, 4.)  Priest claims she suffered whiplash and permanent injuries to her right elbow as a result of the Accident.  (Compl. ¶ 6.)

Two days after the Accident, Priest sought medical treatment complaining of head and neck pain.  (Martin Decl. dated January 16, 2015 ("Jan. 16th Martin Decl.") Ex. C, at 3.)[1]  The emergency room physician diagnosed "headache, minor closed head injury without loss of consciousness, acute cervical strain, and a single contusion with soft tissue hematoma on her right elbow" and prescribed pain medication and physical therapy.  (Jan. 16th Martin Decl. Ex. C, at 4.)  The physical therapist treated Priest primary for head and neck pain through January 2012.  (Jan. 16th Martin Decl. Ex. C,

---

[1]Exhibit C to the January 16, 2015 Martin Declaration is a September 23, 2013 letter from Priest's legal counsel summarizing her injuries and treatment apparently attached as an exhibit to the Claim.

at 4.)  For a period of two months starting in late January 2012, Priest received acupuncture treatments for neck, upper back, and right elbow pain.  (Jan. 16th Martin Decl. Ex. C, at 4.)

Despite her injuries, Priest was able to maintain her employment as a high-level ski instructor.  Priest testified at her deposition she worked as an instructor twenty-four days during the 2011-12 ski season.  (Priest Depo. 24:14-22.)[2]  Priest also taught clinics and administered certification exams at Bachelor and Snoqaulmie on six additional days during that ski season.  (Priest Depo. 24:24-25:5.)  In March of 2012, Priest posted on Facebook she crashed while skiing at Meadows.  (Priest Depo. 122:1-18.)  She hurt her left knee but was able to ski to the lodge, where she decided to quit and return home.  (Priest Depo. 124:8-16.)  Priest did not see a doctor or tell Dr. Durkan or her physical therapist about it, and her knee healed on its own in a couple weeks.  (Priest Depo. 124:16-22.) Priest had previously posted on her Facebook pay she suffered from tennis elbow as a result of yoga in June 2010 and fell down the stairs in August or September 2010.  (Priest Depo. 117:6-12; 119:2-5).  She did not seek treatment for either event.  (Priest Depo. 188:3-6; 119:22-25.)

On May 1, 2012, Priest sought treatment from John A. Durkan, MD., primarily for complaints of "increased tingling in the 4th and 5th fingers of her right hand which worsened with repetitive use of that arm or when she held onto objects."  (Jan. 16th Martin Decl. Ex. C, at 4.)  Priest reported pain up to eight, on a ten-point scale, with the average of five.  (Martin Decl. Ex. C, at 4.)  Upon examination, Dr. Durkan found the "ulnar nerve was sensitive to palpation and appeared to be perched slightly on the edge of the normal cubital tunnel area adjacent to the medial epicondyle."  (Jan. 16th Martin Decl. Ex. C, at 4.)  He diagnosed Priest with "significant contusion to the elbow

---

[2]The Priest Deposition is attached as Exhibit A to the Martin Declaration dated May 14, 2015.

with scar tissue and swelling around the ulnar nerve damage" and recommended "neurologic nerve conduction testing of the ulnar nerve in the cubital tunnel region. (Jan. 16th Martin Decl. Ex. C, at 4.)

Upon presentation at Columbia Gorge Neurology for testing later that month, Priest complained of right arm pain and numbness. (Jan. 16th Martin Decl. Ex. C, at 4.) The neurological exam was normal and "nerve conduction testing showed normal function of the ulnar nerve." The reviewing physician opined "the irritation of the ulnar nerve is due to local tissue damage, particularly with certain positions and daily activity." (Jan. 16th Martin Decl. Ex. C, at 4.)

In June 2012, Priest reported continued symptoms in her right elbow, including burning sensations and pins-and-needles feelings, with the pins-and-needles referring to her fourth and fifth digits on her right hand, and pain levels between one and eight, with an average between three and four. (Jan. 16th Martin Decl. Ex. C, at 4.) Dr. Durkan "recommended another round of physical therapy directed at right arm strengthening, scar tissue mobilization, and reducing inflammation." (Jan. 16th Martin Decl. Ex. C, at 4.) Preist completed her second round of physical therapy on July 26, 2012. (Jan. 16th Martin Decl. Ex. A, at 2.)

In a July 31, 2012 office note, Dr. Durkan characterized Priest's injury as "a contusion of the ulnar nerve on the right arm" that is continuing to improve with "good days and occasional days where the symptoms of tingling recur" with activities such as bike-riding and excessive or repetitive muscle strengthening exercises. (Hill Decl. dated January 2, 2015 ("Jan. 2nd Hill Decl.") Ex A.) Dr Durkan noted "[a]t this point, the patient is showing continued signs of improvement. It will likely take the expected 18 months or so to have complete resolution of symptoms. The patient will monitor her condition closely and notify me if there are any changes of significance." (Jan. 2nd Hill

PAGE 4 - FINDINGS AND RECOMMENDATION                    *{SIB}*

Decl. Ex A.)

Priest advised her physical therapist she and Dr. Durkan had mutually decided she would discontinue physical therapy. (Jan. 16th Martin Decl. Ex. A, at 2.) Priest reported to her physical therapist "Dr. Durkan felt that because she responded favorably to physical therapy, she would not likely need a surgical intervention," "the injury would likely take up to the next year to completely recover," and she would see gradual gains with but should expect occasional increased and decreased symptom levels depending on her activities. (Jan. 16th Martin Decl. Ex. A, at 2.) On August 2, 2012, the physical therapist noted Priest had an "overall favorable response to physical therapy," "was able to tolerate resumption of many activities," "met fifty percent of the stated goals set for her," and was "appropriate for discharge at this time." (Jan. 16th Martin Decl. Ex. A, at 2.)

In September 2013, Priest filed the Claim with the Postal Service seeking $246,389.87 in total damages: $11,784.22 for property damage consisting of car repair and rental costs; $9,605.65 for economic damages consisting of medical and physical therapy expenses; and $225,000.00 for non-economic damages consisting of pain, suffering, and impairment of her normal and usual activities. (Jan. 16th Martin Decl. Ex. C, at 1.) The Claim was deemed rejected by the Postal Service on March 23, 2014. (Compl. ¶ 9.) Priest filed this lawsuit against the United States on March 26, 2014.[3]

Priest's right elbow pain continued through the summer of 2014, when she returned to Dr. Durkan seeking additional treatment. (Pl.'s Mot. to Amend ("Mot.") at 2; (Hill Decl. dated Aporil 30, 2015 ("April 30th Hill Decl.") Ex. A, at 10.) Dr. Durkan referred Priest to Adam J. Mirarchi, M.D. (Mot. at 2.) Later that summer, Priest responded to the United States' request for admissions

---

[3]Priest is not seeking her property damages in this action.

in which the United States sought an admission that "no doctor, physician, or surgeon has advised you that surgery is necessary regarding your alleged injuries from the incident." (Jan. 16th Martin Decl. Ex. B.)  In her response, Priest's admitted "no provider has used those words without qualification, qualified by the fact that further evaluation is currently ongoing and Ms. Priest has been referred to another surgeon, and that the July 2012 statement was that surgery is probably not necessary which implies some likelihood that surgery is necessary." (Jan. 16th Martin Decl. Ex. B, at 2.)

    In September 2014, Priest complained  to Dr. Mirarchi of constant pain at a level from two to eight which worsened with driving and improved with rest with numbness in the small and ring fingers but no weakness.  (Hill Decl. dated January 30, 2015 ("Jan. 30th Hill Decl.") Ex. B, at 1.) Upon examination, Dr. Mirarchi noted "pain to palpation over the medial epicondyle of the right elbow" and subluxation of the ulnar nerve out of the cubital tunnel upon flexion of the right elbow. (Jan. 30th Hill Decl. Ex. B, at 2.)  X-rays of the right elbow revealed no acute fracture or subluxation. (Jan. 30th Hill Decl. Ex. B, at 2.)  Dr. Mirarchi diagnosed "right cubital tunnel syndrome with sublexing ulnar nerve at the cubital tunnel" and discussed both operative and non-operative care options with Priest. (Jan. 30th Hill Decl. Ex. B, at 3.)  Dr. Mirarchi noted because she had been dealing with the pain for three years, Priest was not interested in continuing non-operative care and "would like to proceed with submuscular transposition of the right ulnar nerve." (Jan. 30th Hill Decl. Ex. B, at 3.)

    On October 3, 2014, Dr. Mirarchi performed ulnar submuscular transposition surgery on Priest's right elbow (the "Surgery"). (Mot. at 2.) Priest started post-surgery rehabilitation treatment on October 28, 2014 (the "Therapy"), which ended in January 2015 and is expected to be the last

treatment for Priest's right elbow injury.  (Mot. at 2.)

In the Motion filed January 2, 2015, Priest moves to amend the Complaint to increase the economic and non-economic damage amounts based on the Surgery and Therapy.  Specifically, Priest seeks to increase her economic damages to $29,997.91, and her non-economic damages to $350,000.  Priest filed the Supplement on April 30, 2015, asking to amend the Motion to include medical expenses incurred or received after the Motion was filed and increase her economic damages to $32,521.55.  (Pl.'s Supplement to Motion to Amend ("Supp.") at 2.)

*Legal Standard*

I. Federal Tort Claims Act

As a sovereign, the United States is immune from suit except to the extent it specifically consents to be sued.  *Canton v. United States*, 495 F.2d 636, 637 (9th Cir. 1974).  The Act waives the United States' sovereign immunity over certain claims against the United States for injuries caused by the negligent or wrongful act or omission of any government employees acting within the scope of employment.  *Dolan v. U. S. Postal Serv.*, 564 U.S. 481, 482 (2006).  Any waiver of sovereign immunity must be strictly and narrowly construed in favor of the United States.  *Lane v. Pena*, 518 U.S. 187, 192 (1996).

Before a party may bring suit in federal court against the government under the Act, they must first present their claim to the appropriate federal agency within two years after the claim accrues.  28 U.S.C. §§ 2401(b), 2675(a) (2015).  *See Canton*, 495 F.2d at 638.  A claim is deemed presented for the purposes of the Act when a party files: "(1) a written statement sufficiently describing the injury to enable the agency to begin its own investigation, and (2) a sum certain damages claim."  *Warren v. U. S. Dept. of Interior Bureau of Land Mgmt*, 724 F.2d 776, 780 (9th

Cir. 1984).  An action may be commenced when the agency denies the claim or fails to finally dispose of a claim within six months.  28 U.S.C. § 2675(a).  *Id*. at 778.

Generally, a plaintiff pursuing a legal action in court against the United States is limited to the amount of damages sought in the administrative claim.  28 U.S.C. § 2675(b) (2015).  An exception to this general rule exists when "the increased amount is based upon newly discovered evidence not reasonably discoverable at the time of presenting the claim to the federal agency, or upon allegation and proof of intervening facts, relating to the amount of the claim."  28 U.S.C. § 2675(b).  The plaintiff has the burden of proving the existence of newly discovered evidence or intervening facts.  *Spivey v. United States*, 912 F.2d 80, 85 (4th Cir. 1990).

## II. Motion to Amend under Rule 15

Once a defendant has filed a responsive pleading – as is the case here – a plaintiff may amend their "pleading only with the opposing party's written consent or the court's leave.  The court should freely give leave when justice so requires."  FED. R. CIV. P. 15(a) (2015).  "Although the rule should be interpreted with 'extreme liberality,' leave to amend should not be granted automatically." *Jackson v. Bank of Hawaii*, 902 F.2d 1385, 1387 (9th Cir. 1990)(internal citation omitted).  A trial court may deny the motion if permitting amendment would prejudice the opposing party, produce an undue delay in litigation, result in futility for lack of merit, is sought by plaintiffs in bad faith or with a dilatory motive, or the plaintiffs have filed numerous amended complaints. *Foman v. Davis*, 371 U.S. 178, 182 (1962); *DCD Programs, Ltd. v. Leighton*, 833 F.2d 183, 186 (9th Cir. 1987). Prejudice to the opposing party carries the "greatest weight" in determining whether to deny leave to amend.  *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003).  Whether to grant leave to amend lies within the sound discretion of the trial court.  *United States v. Webb*, 655

PAGE 8 - FINDINGS AND RECOMMENDATION                    *{SIB}*

F.2d 977, 979 (9th Cir. 1981).  In exercising this discretion, however, the court "must be guided by the underlying purpose of Rule 15 to facilitate decision on the merits, rather than on the pleadings or technicalities." *Id*.

III. Motion to Amend under Rule 16

The Federal Rules of Civil Procedure provide that a scheduling order "may be modified only for good cause and with the judge's consent." FED. R. CIV. P. 16(b)(4) (2015).  Further, the Local Rules mandate that "objections to any court imposed deadline must be raised by motion and must: (1) Show good cause why the deadlines should be modified[;] (2) Show effective prior use of time[;] (3) Recommend a new date for the deadline in question [; and] (4) Show the impact of the proposed extension upon other existing deadlines, settings, or schedules." LR 16-3(a) (2015).  The primary factor in determining whether good case exists is whether the party seeking amendment was diligent in pursuing the amendment.  *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 609 (9th Cir. 1992).  If the party who seeks modification of the scheduling order did not act diligently in doing so, "the inquiry should end," and the motion should be denied.  *Id*.

*Discussion*

Priest moves to amend the Complaint to include damages related to the Surgery and Therapy. She asserts the damages resulted from new, unforeseen, and materially significant intervening facts and justify the amendment.  The United States argues the Surgery was not an intervening fact, the Surgery was foreseeable, evidence in the record does not support the increase in damages, and the filing of the Supplement was not timely under Rule 16.  The court will discuss each issue in turn.

I. Federal Tort Claims Act

For Priest to prevail on her request to amend the Complaint to allege damages in excess of

those sought in the Claim, she must prove the Surgery, Therapy, and increased non-economic damages resulting therefrom, fall within the exceptions for newly discovered evidence or intervening facts under the Act. While many courts recognize these two exceptions are distinct, with "newly discovered evidence" referring to evidence existing, but not discoverable, at the time a claim is filed and "intervening facts" relating to information or events arising after the filing of the claim, the key issue for both exceptions is foreseeability. *Salas v. United States*, Civil No. 12cv0337 JAH(BLM), 2013 WL 6244144, at *3 (S. D. Cal. Dec. 2, 2013) (citing *Lowry v. United States*, 958 F. Supp. 704, 710-11 (D. Mass. 1997)); *Richardson v. United States*, 841 F.2d 993, 999 (9th Cir. 1988). If the condition, or required medical treatment, was reasonably foreseeable at the time the claim was filed, an increase in damages will not be allowed. *Richardson*, 841 F.2d at 999.

Information a plaintiff could have discovered with reasonable diligence does not qualify as newly discovered evidence or intervening facts. *Id.* (citing *Low v. United States*, 795 F.2d 466, 470 (5th Cir. 1986)). Furthermore, when a claimant is on notice, through existing medical information and physician advice of worst case scenarios based on established diagnoses, the eventual materialization of such scenarios does not qualify as newly discovered evidence. *Michels v. United States*, 31 F.3d 686, 688 (8th Cir. 1994); *Low*, 795 F.2d at 471. However, a claimant "should not be charged with knowing what the doctors could not tell them." *Fraysier v. United States*, 766 F.2d 478, 481 (11th Cir. 1985). The worsening of a known injury in ways not reasonably discoverable to a physician or claimant can support an increase in damages under the Act. *Michels*, 31 F.3d at 688. In the words of the Eleventh Circuit, "[t]he purpose of section 2675(b) undoubtedly is to limit claims on which there is only a change in valuation between the agency claim and the lawsuit. *Fraysier*, 766 F.2d at 480.

Priest was injured in November 2011. She immediately began treatment for her injuries,

PAGE 10 - FINDINGS AND RECOMMENDATION                                *{SIB}*

including that to her right elbow, that continued through late March, 2012. In May 2012, Priest sought treatment for increased pain in her right elbow and tingling in her right fingers. Dr. Durkan noted the ulnar nerve was perched slightly on the edge of normal. Testing performed later that month revealed normal functioning of the ulnar nerve with irritation due to local tissue damage. At Dr. Durkan's recommendation, Priest participated in a second round of physical therapy, which she completed in late July 2012. Thereafter, Dr. Durkan expected Priest would have complete resolution within eighteen months with occasional increases in symptoms based on activities, and would likely not need surgical intervention. On August 2, 2012, the physical therapist noted improvements in Priest's symptoms and her ability to tolerate resumption of many activities. Priest filed the Claim in September 2013 and the Complaint in March 2014.

In June of 2014, after giving her right elbow time to heal on its own, Priest again sought treatment complaining of constant pain and numbness. Dr. Mirarchi eventually diagnosed a subluxation of the right ulnar nerve upon flexion and discussed surgical options. He performed the Surgery on October 3, 2014.

At the time she filed the Claim, Priest had experienced improvement with physical therapy and it appeared, in accordance with Dr. Durkan's advice, her right elbow would heal on its own without the need for surgical intervention. It was not until after she filed the Claim, and the recommended eighteen-month recovery period expired, that Priest became aware her right elbow would not heal on its own due but would require surgery to resolve the issue. Priest reasonably relied on Dr. Durkan's opinion the irritation to the tissue damage causing inflammation of the ulnar nerve would be resolved with physical therapy and time, which opinion was supported by Priest's improvement during and after physical therapy. Based on this evidence, the court finds the unexpected need for surgery is a newly discovered evidence or intervening fact not reasonably

foreseeable at the time Priest filed the Claim.

This finding is supported by, and consistent with, holdings of other courts in what have been labeled "change in expectation" cases. The general consensus in these cases is that "just because an outcome may be conceivable does not render it reasonably foreseeable." *Resnansky v. United States*, Case No. 13-cv-05133-DMR, 2015 WL 1968606, at *4 (N. D. Cal. May 1, 2015). On February 1, 2013, Resnansky suffered injuries to her left wrist and right ankle when she was struck by a vehicle owned by the United States and driven by a United States employee. *Id.* at *1. Resnansky's wrist fracture was repaired with surgery while her ankle fracture was treated with a protective boot and physical therapy. *Id.* at *2. On May 1, 2013, Resnansky filed an administrative claim seeking $1,000,000 in damages and, on November 4, 2013, filed her complaint. *Id.* at *1. By mid-November 2013, Resnansky's wrist had not healed, continued to be painful, and required a second surgery which occurred on December 17, 2013. *Id.* at *2. Similarly, after completing physical therapy in August 2013, Resnansky's right ankle began bothering her as she attempted to increase the duration of her exercise. *Id.* She consulted with her doctor in June 2014, who performed surgery in September 25, 2014. *Id.* Subsequently, Resnanksy moved to increase her damage claim to $4,000,000. *Id.*

The *Resnansky* court found the ankle surgery was not reasonably foreseeable based on the physician's report the ankle showed good evidence of healing and the lack of evidence of deterioration prior the filing of the claim. *Id.* at *6. The court considered the absence of a recommendation of surgery, or a statement surgery would likely be necessary in the future, and the physician's prescribed treatment as evidence the physician believed a conservative course of treatment with emphasis on physical therapy would be sufficient. *Id.* On the other hand, the court found the second surgery on Resnansky's wrist was reasonably foreseeable. *Id.* at *7. Despite initial

improvement after surgery, Resnansky continued experiencing wrist pain from the date of the initial surgery through November 2013, when she sought additional treatment. *Id*. The court found Resnansky's knowledge of her ongoing pain and symptoms after the initial surgery and before she filed her administrative claim made the additional treatment foreseeable. *Id*.

The *Resnansky* opinion contained a detailed description of the standard applicable to a request to increase damages under 28 U.S.C. § 2675(b), and referenced several other "change in expectation" cases. For example, the court noted in *Michels*, increased damages were allowed based on a finding the post-claim surgery was not reasonably foreseeable even though the plaintiff's doctor noted a possible, thought not likely, need for future surgery. *Resnansky,* 2015 WL 1968606, at *4. Similarly, in *Smith v. United States*, No. C 10-00212 WHA, 2011 WL 4551471 (N. D. Cal. Oct. 3, 2011), a doctor's pre-claim statement "it is conceivable that [plaintiff] might require some surgical intervention in the future but, if the fracture is not severe, this would be rather unlikely" did not make post-claim surgery reasonably foreseeable. *Resnansky,* 2015 WL 1968606, at *4. The court also noted cases, such as *Craig v. United States*, No. 00 C 958, 2002 WL 31115604 (N. D. Ill. Sept. 23, 2002), in which a plaintiff's reliance on a treating physician's recommendation of conservative, non-surgical treatment seemingly successful at the time an administrative claim is filed, did not make post-claim surgery, previously not considered a realistic possibility, reasonably foreseeable. *Resnansky,* 2015 WL 1968606, at *5.

While the Ninth Circuit has not directly addressed this issue, it did reference, with approval, the Fifth Circuit's analysis in *Low*. *See Richardson*, 841 F.2d at 999. In *Low*, the court noted it had previously "allowed an increase over the amount administratively claimed when, at the time the claim was filed, the claimant did not know and could not have ascertained that an injury would not heal without surgery." *Low*, 795 F.2d at 470 (citing *United States v. Alexander*, 238 F.2d 314, 317-

38 (5th Cir. 1956)).  However, the *Low* court reduced the trial court's award to the amount sought in the administrative claim, finding the limitations resulting from diagnoses of cerebral palsy, seizure disorder, blindness, deafness, and mental retardation were reasonably foreseeable at the time of diagnosis.  *Low*, 795 F.2d 471.

Here, Dr. Durkan recommended conservative treatment involving physical therapy and time, and Priest was experiencing positive results from the treatment at the she filed the Claim.  Therefore, despite Dr. Durkan's implication need for surgery in the future was a possibility, surgery was not reasonably foreseeable.

The United States argues Priest's failure to seek treatment for her elbow for nearly two years after she completed physical therapy in July 2012, along with evidence she resumed her regular activities in 2013, establishes Priest's condition improved during this period thereby preventing her from recovering additional non-economic damages.  To the contrary, this evidence and conclusion supports a finding the surgery was not reasonably foreseeable.  Dr. Durkan advised Priest she should gradually improve over the next eighteen months, with occasional increases in symptoms.  That Priest followed this advice, did not seek additional treatment, and attempted to return to regular activities is evidence the conservative treatment was working.  However, the symptoms did not totally resolve during this period forcing Priest to seek additional medical treatment and the previously unexpected Surgery.

The United States also asserts Priest admitted in her response to its request for admissions the Surgery was foreseeable.  Priest indicated Dr. Durkan's July 2012 statement surgery was probably not necessary implied some likelihood surgery was necessary.  This admission is not fatal to Priest's attempt to increase her damages as she only admitted to an implication of some likelihood surgery would be necessary.  Evidence of a possible need for future surgery, if such surgery is

considered fairly unlikely, does not render the future surgery reasonably foreseeable.

Finally, the United States contends the record does not establish the Surgery and Therapy were the result of the Accident, pointing to other incidents which might have caused the injury. Dr. Mararchi's notes indicate Priest's elbow pain and finger numbness are related to the Accident and Priest experienced symptoms since the time of the Accident. Additionally, Dr. Mararchi's diagnosis appears consistent with that of Dr. Durkan. Priest has presented sufficient evidence, at this stage and for the purpose of her motion to amend, to establish a causal connection between the Accident and the Surgery.

A plaintiff seeking to increase a damage claim under Section 28 U.S.C. § 2675(b) may recover such increased damages only to the extent they are attributable to the newly discovered evidence or intervening facts. *Resnansky,* 2015 WL 1968606 at \*10 (quoting *Craig*, 2002 WL 31115604, at \*5.) Priest has clearly supported her increased economic damages with itemized statements from the medical providers. However, the United States claims the record does not justify a $125,000 increase in non-economic damages in light of Priest's resumption of her ski instruction and real estate work after the Claim.

The sole evidence offered by the United States in support of this argument is Priest's resume, provided to the United States in August 2014, in which Priest represents she has worked in real estate since 2004 and as a ski instructor at Mt. Hood Meadows Ski Resort since 1998. (Jan. 16th Martin Decl. Ex. A at 4.) Priest does not indicate how much time she spent in these occupations after she filed the Claim, only that she continued working in that capacity. Priest could have continued these activities in a limited capacity, a conclusion supported by the description of her limitations in the Claim. In a letter apparently attached to the Claim, Priest represented that during the course of her treatment, she "was unable to engage in her ususal daily activities that were

customary prior to the subject collision" including "working her job as a real estate agent [and] working as a ski instructor. . . ." (Jan. 16th Martin Decl. Ex. C at 5.)  However, Priest also represented that "[a]nything which requires use of her right arm while bent now hurts her elbow." (Jan. 16th Martin Decl. Ex. C at 5.)  The continuing pain in her right elbow may well have limited her activities after she filed the Claim.  In any event, her activities would clearly have been limited by the Surgery and Therapy.  These non-economic damages are attributable to newly discovered evidence or intervening facts and support an increase in Priest's non-economic damages.

Additionally, Priest's requested increase in non-economic damages is likely due, at least in part, to the increase in emotional distress, and pain and suffering resulting from the Surgery and Therapy, which is not contingent on her ability to work in her prior occupations between the filing of the Claim and the Surgery.  This case is easily distinguishable from *Smith v. United States*, No. C 10-00212-WHA 2011 WL 4551471, at *6 (N. D. Cal. Oct. 3, 2011), in which the court held an early diagnosis of post-traumatic stress disorder and initial claim based, in part, on specific allegations of "severe emotional distress and undue hardship," prevented plaintiff from increasing his damages due to additional emotional distress related to additional surgeries.  The court reasoned the increased damages related to the precision of the initial diagnosis of post-traumatic stress disorder and was not newly discovered evidence or an intervening fact.  *Id*.  Here, there was no diagnosis of an emotional disorder resulting from the Accident.  Therefore, the emotional distress caused by the unforeseeable need for the Surgery is not related to an existing diagnosis and constitutes newly discovered evidence or an intervening fact.

The Surgery and Therapy were not reasonably foreseeable at the time the Claim was filed. Priest's alleged economic damages relating to the Surgery and Therapy are adequately supported by the record.  Priest also has offered evidence to support her claim for increased non-economic

damages as a result of the unexpected continuing limitation in her right elbow, the Surgery, and the Therapy.[4]

## II. Motion to Amend under Rule 15

The Ninth Circuit has required a plaintiff, after establishing they are entitled to increase their damage claim under 28 U.S.C. § 2675(b), to also comply with Rule 15 of the Federal Rules of Civil Procedure, at least with regard to the timing of the attempt to amend. *Richardson*, 841 F.2d at 999. *See also Resnansky*, 2015 WL 1968606, at *9 (district court addressed defendant's arguments the motion was filed untimely and unanticipated under Rule 15 after finding increase of damages appropriate under section 2675(b) ).[5] In *Richardson*, the court noted "mere passage of time, by itself, is insufficient; rather, there must be an affirmative showing of either prejudice bad faith." *Id*.

The United States does not argue the Motion was filed untimely or in bad faith, or resulted in any prejudice. As such, the Motion is proper under Rule 15. The United States does assert the Supplement was filed more than three months after the deadline to amend the pleadings and is, therefore, untimely under Rule 16 of the Federal Rules of Civil Procedure.

## III. Motion to Supplement under Rule 16

On October 6, 2014, the court ordered the parties to file any amendments to the pleadings by January 5, 2015. Priest filed the Supplement on March 30, 2015, more than three months after the deadline. In the Supplement, Priest seeks leave to the amend the Motion to include updated

---

[4]The court's findings are limited to the procedural question before it. Whether in fact the additional damages Priest alleges are causally linked to her initial injury and subsequent surgery is yet to be determined.

[5]In *Resnansky*, the court questioned whether a plaintiff seeking to increase their damage amount must move to amend under Rule 15, noting courts have allowed such amendments, even after trial. *Resnansky*, 2015 WL 1968606, at *9. In any event, the court did find it "appropriate to consider what prejudice might result from a late request to augment damages beyond the administrative claim. *Id*. at 10.

figures for the Therapy and a follow-up visit to Dr. Mirarchi.

First, the court is not convinced Rule 16 applies to the Supplement, which seeks merely to provide definite amounts previously estimated in the timely-filed Motion.  Second, courts have allowed plaintiffs to increase their damage amounts in actions under the Act up to and through trial without considering the timeliness of the motion.  *See Resnansky*, 2015 WL 1968606, at *9 ("Courts have permitted plaintiffs to recover in excess of the amounts stated in their administrative claims at various stages of lawsuits, including after trial, without requiring those plaintiffs to move separately under Rule 15 to amend their pleadings.").  Finally, the court finds good cause exists to allow the filing of the Supplement.  Priest was diligent in filing the motion. Her follow-up visit with Dr. Mirarchi occurred on March 10, 2015, and she filed the Supplement less than three weeks later.

## Conclusion

Priest's motion (#16) to amend the Complaint and her supplement (#35) to the Motion should be GRANTED.

## Scheduling Order

The above Findings and Recommendation will be referred to a United States District Judge for review.  Objections, if any, are due **October 17, 2015**. If no objections are filed, review of the Findings and Recommendation will go under advisement on that date.

If objections are filed, a response to the objections is due fourteen days after the date the objections are filed and the review of the Findings and Recommendation will go under advisement on that date.

DATED this 30th day of September, 2015.


_____
/s/ John V. Acosta
JOHN V. ACOSTA
United States Magistrate Judge


PAGE 18 - FINDINGS AND RECOMMENDATION                              *{SIB}*